UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RICHARD SMITH, JR., | ) |
| Plaintiff, | ) 17 C 7609 |
| vs. | ) Judge Gary Feinerman |
| COOK COUNTY and OFFICE OF THE CHIEF JUDGE OF THE CIRCUIT COURT OF COOK COUNTY, | ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

Richard Smith, Jr. brought this suit against his former employer, the Office of the Chief Judge of the Circuit Court of Cook County ("OCJ"), alleging that it fired him due to his disability and failed to accommodate his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Doc. 24. Trial is set for June 10, 2019. Doc. 65. OCJ moves for summary judgment. Doc. 41. The motion is granted.

### Background

The following facts are set forth as favorably to Smith, the non-movant, as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 636 (7th Cir. 2018).

Smith worked as a Youth Development Specialist ("YDS") at the Cook County Juvenile Temporary Detention Center ("JTDC") between October 2011 and his termination on April 27, 2016. Doc. 51 at ¶¶ 8, 37. The JTDC, which is operated by OCJ, houses pretrial detainees between 12 and 21 years old at seven 24-hour residential centers. *Id.* at ¶¶ 1-2; Doc. 56 at ¶ 1.

1

Assigned to the Legacy residential center, Smith looked after 18 JTDC residents and worked alongside some 26 YDSs. Doc. 51 at ¶¶ 10-11; Doc. 56 at ¶ 1.

To ensure safety and maintain constitutionally adequate services, OCJ expected YDSs to work overtime and be available for all three eight-hour shifts, including the overnight shift. Doc. 51 at ¶¶ 12-15. YDS job description set forth these expectations. *Id*. at ¶ 12; Doc. 43-3 at 57-58; Doc. 52-14 at 4. The ability of YDSs to work extra shifts was important because about 35% of JTDC employees were on various types of leave (*e.g.*, sick, vacation, disability, injured on duty, Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.) throughout Smith's tenure. Doc. 51 at ¶ 18; Doc. 43-4 at ¶ 9.

Under the governing collective bargaining agreement ("CBA"), YDSs bid for shifts based on seniority. Doc. 56 at ¶ 27. The CBA also required that employees be selected from a list for mandatory overtime, and provided that once an employee worked a mandatory overtime shift, he would be moved to the bottom of the list. *Id*. at ¶ 21. Volunteering for an overtime shift, however, would not change an employee's position on the mandatory overtime list. *Ibid*. When Smith was fired, YDSs could work overtime assignments only within their residential center. Doc. 56 at ¶ 22; Doc. 52-9 at 10. Additionally, YDSs working the overnight shift were often required to work overtime because fewer employees worked the overnight shift and more employees requested leave for the morning shift. Doc. 51 at ¶ 20; Doc. 43-4 at ¶ 12.

Although YDSs were expected to work overtime to cover staffing shortages, YDSs with FMLA leave could limit their overtime or avoid it altogether; some 79 YDSs, including six at the Legacy center, used intermittent FMLA leave to reduce or eliminate their mandated overtime in 2017 and 2018. Doc. 51 at ¶ 52; Doc. 56 at ¶¶ 23-24. Despite this, the JTDC since 2015 always found enough YDSs to work overtime. Doc. 56 at ¶¶ 25-26.

As a YDS, Smith was expected to and did work "all shifts and a lot of overtime"—much of it mandatory—until he was injured at work in September 2014 and placed on leave. Doc. 51 at ¶¶ 17, 24; Doc. 56 at ¶ 21; Doc. 52-2 at 18. In March 2015, while still on "Injured on Duty" leave, Smith developed a pulmonary embolism and ascending aortic aneurysm. Doc. 56 at ¶ 2. Due to those conditions, Smith's physician ordered that he work only the overnight shift and avoid overtime upon his return to the JTDC. Doc. 52-16 at 2, 5; Doc. 51 at ¶ 26; Doc. 56 at ¶ 4.

During Smith's leave, OCJ told him that because the JTDC did not have "light duty" positions, he could resume working only when his work restrictions were lifted. Doc. 51 at ¶¶ 22, 28; Doc. 56 at ¶ 4. Once Smith exhausted his leave, he applied for and received disability benefits through April 26, 2016. Doc. 51 at ¶ 27; Doc. 56 at ¶¶ 4-5; Doc. 52-17. Smith did not qualify for FMLA leave for his embolism and aneurysm because he had not worked the requisite number of hours following his diagnosis. Doc. 51 at ¶ 49; Doc. 52-2 at 29; *see* 29 U.S.C. § 2611(2)(A)(ii).

On April 25, 2016, the day before his disability benefits expired, Eboni Montsho, JTDC's human resources director, called Smith. Doc. 56 at ¶ 8; Doc. 51 at ¶ 32. Smith asked Montsho if he could work only the overnight shift and avoid overtime until August 2016, when his physician was scheduled to reexamine him. Doc. 56 at ¶ 8; Doc. 52-19. Montsho responded that Smith's continued inability to work overtime and non-overnight shifts prevented him from returning to work. Doc. 56 at ¶ 9. Smith followed up later that day with an email to Montsho requesting an "ADA … accommodation" so that he could resume working. Doc. 56 at ¶ 8; Doc. 52-18 at 4. Although Smith's physician wanted him to "'crawl, walk, and then run,' i.e., … to test the waters before" all restrictions were lifted, there is no evidence that Smith or his physician communicated that understanding to OCJ. Doc. 56 at ¶ 8 (quoting Doc. 52-2 at 31).

3

Montsho followed up with an April 26, 2016 letter that denied Smith's requested accommodation to "wor[k] forty (40) hours per week on [the overnight] shift only until August, 2016 when [he] would be re-evaluated by [his] physician." Doc. 56 at ¶ 12 (quoting Doc. 52-19). As in their phone conversation, Montsho's letter asserted that Smith's request would impose "a significant financial and operational hardship" on the JTDC. *Id*. at ¶¶ 9, 12. Accordingly, Montsho advised Smith that he would be fired if he could not immediately return to work without those restrictions. *Id*. at ¶ 12. On April 27, Smith emailed Montsho and offered to take a pay cut or work elsewhere in the JTDC. Doc. 56 at ¶ 13. Montsho's reply encouraged Smith to apply for other Cook County positions but reaffirmed the termination. *Ibid*.; Doc. 51 at ¶ 37. When he was fired, Smith had enough seniority to receive the overnight shift if he resumed working. Doc. 51 at ¶¶ 49, 53; Doc. 56 at ¶ 27.

When a JTDC employee requested an ADA accommodation, Alsera Hayes, JTDC's leave coordinator, as a general rule would meet with the employee and his union, collect information, and communicate her findings to Montsho, who then would consult with JTDC's general counsel's office before making a final decision. Doc. 56 at ¶ 11. However, Montsho, Hayes, JTDC General Counsel Zenaida Alonzo, and JTDC Superintendent Leonard Dixon either did not speak or do not recall speaking before Smith's termination about his requested accommodation. *Id*. at ¶¶ 16-18. Additionally, despite the CBA's requirement that OCJ, the employee, and a union representative "meet to discuss" the employee's request for a reasonable accommodation, Smith did not speak to anyone besides Montsho before his termination. *Id*. at ¶¶ 10, 16, 18 (quoting Doc. 52-11 at 33). And Montsho does not recall whether, before Smith was terminated, she or anyone else ascertained the financial hardship that his requested accommodations would impose on the JTDC. *Id*. at ¶ 19.

On June 15, 2016, Smith submitted a union grievance concerning the denial of his requested accommodation. Doc. 51 at ¶ 38; Doc. 56 at ¶ 14. On July 15, 2016, Smith discussed his grievance with Montsho, his union steward George Sanchez, and Alonzo. Doc. 51 at ¶ 39. Smith asked to return to work as a YDS only on the overnight shift and without overtime until his next medical examination in August 2016. *Id*. at ¶ 40; Doc. 52-2 at 42. Neither Smith nor OCJ identified an available position that would accommodate those restrictions, and he did not ask OCJ to create a new position for him. Doc. 51 at ¶ 43; Doc. 56 at ¶ 14.

Although Sanchez, on behalf of the union, was willing to override the CBA's provisions regarding overtime and shift assignments until Smith's August 2016 medical evaluation, OCJ declined to offer an ADA accommodation. Doc. 51 at ¶¶ 41, 44; Doc. 52-9 at 10. In addition to noting that the union was willing to override the CBA only through August 2016 and not thereafter, OCJ's denial letter explained that maintaining "adequate staffing levels" at "all times" required employees to work overtime and that OCJ could not "create [a] new positio[n]" for Smith. Doc. 51 at ¶ 45 (quoting Doc. 52-20 at 2). In his current job with the U.S. Postal Service, Smith's health conditions require work restrictions. Doc. 56 at ¶ 28.

While a YDS, Smith observed and briefly worked with individuals in red polo shirts who had light duty responsibilities and did not interact with JTDC residents. Doc. 51 at ¶¶ 54-55; Doc. 52-2 at 46. In 2015, however, OCJ restored those individuals to full duty and eliminated their light duty status. Doc. 51 at ¶ 56. OCJ has not provided any JTDC employee an ADA accommodation of working only the overnight shift and not working overtime, and no position existed in July 2016 that was exempt from overtime and out-of-shift work requirements. *Id*. at ¶¶ 46, 50; Doc. 43-4 at ¶¶ 15-16. (Smith's denials of these facts do not cite record evidence supporting the denials, so the court deems the facts admitted. *See* N.D. Ill. L.R. 56.1(b)(3)(C)

5

("All material facts set forth in the [Local Rule 56.1(a)(3)] statement … will be deemed to be admitted unless controverted by the statement of the opposing party.").)

**Discussion**

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability," which includes failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee." 42 U.S.C. § 12112(a)-(b). This antidiscrimination protection allows for both "disparate treatment *and* failure to accommodate" claims. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (citing 42 U.S.C. § 12112(b)). Smith brings both claims, alleging that OCJ violated the ADA by terminating him because of his disability and by failing to reasonably accommodate his disability. Doc. 24 at ¶¶ 25-44.

To survive summary judgment on either claim, Smith must adduce evidence sufficient for a reasonable jury to find that "he was a 'qualified individual' at the time [OCJ] fired him." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015); *see also Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018) (holding that the plaintiff's ADA "claims for discrimination and failure to accommodate fail at the start because he cannot demonstrate that he is a 'qualified individual'"); *compare Scheidler*, 914 F.3d at 541 ("A claim for *disparate treatment* based on disability under the ADA … requires proof[ that:] (1) plaintiff was disabled; (2) plaintiff was qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the but for cause of [the] adverse employment action."), *with ibid.* ("A claim for *failure to accommodate* under the ADA … requires proof[ that:] (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of his disability; and (3) defendant failed to accommodate his disability reasonably."). The ADA "defines the

term 'qualified individual' as: 'an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Rodrigo*, 879 F.3d at 241 (quoting 42 U.S.C. § 12111(8)). "[I]t is the plaintiff's burden to" show that he was a qualified individual by "produc[ing] evidence sufficient to permit a jury to conclude that [h]e would have been able to perform the essential functions of h[is] job with [or without] a reasonable accommodation." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 418 (7th Cir. 2016) (internal quotation marks omitted). "The relevant inquiry is whether [Smith] could perform the essential functions of his job [with or without reasonable accommodation] at the time he was fired." *Stern*, 788 F.3d at 287.

It is undisputed for summary judgment purposes that Smith had an ADA-qualifying "disability," 42 U.S.C. § 12102(1), that prevented him from working overtime or any shift except the overnight shift. Doc. 51 at ¶ 31; Doc. 42 at 10; Doc. 53 at 9-11. However, the parties disagree over: (1) whether working overtime and performing out-of-shift work were essential to the YDS position in April 2016; and (2) if so, whether a reasonable accommodation could have allowed Smith to perform those essential functions. The court addresses those two issues in turn. *See Stern*, 788 F.3d at 285, 288 ("First, we identify the essential functions of the job. … We next consider if there is an issue of fact as to whether [the plaintiff] could perform the essential functions of his job *with* reasonable accommodation.").

I. **Whether Overtime and Out-of-Shift Work Were Essential Functions of the YDS Position**

"[A]n essential function need not encompass the majority of an employee's time, or even a significant quantity of time, to be essential. Rather, an essential function must be a fundamental duty of the job." *Basith v. Cook Cnty.*, 241 F.3d 919, 929 (7th Cir. 2001) (citation and footnote omitted); *see also Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22d*

*Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) ("[A]n employer may specify, for legitimate reasons, multiple essential duties for a position … ."). To determine whether overtime and out-of-shift work were "essential" functions of the YDS position, the court considers these factors from the applicable EEOC regulation:

> (i) the employer's judgment; (ii) written job descriptions; (iii) amount of time spent performing the function; (iv) consequences of not requiring the employee to perform the function; (v) terms of a collective bargaining agreement; (vi) work experience of prior employees in the position; and (vii) current work experience of employees in similar jobs.

*Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 854 & n.1 (7th Cir. 2015) (citing 29 C.F.R. § 1630.2(n)(3)); *see also Rodrigo*, 879 F.3d at 242 (similar).

Attendance requirements, including mandatory overtime and rotating shifts, can be "essential" functions under the ADA. *See Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014) ("[A]n employer is generally permitted to treat regular attendance as an essential job requirement … .") (internal quotation marks omitted); *Feldman v. Olin Corp.*, 692 F.3d 748, 755-56 (7th Cir. 2012) (recognizing that "rotating shifts" and "overtime [can comprise] an essential function of the … positio[n]"); *Gavurnik v. Home Props., LP*, 712 F. App'x 170, 175 (3d Cir. 2017) ("Under the ADA, overtime may be considered an essential function of a job."); *Tjernagel v. Gates Corp.*, 533 F.3d 666, 673 (8th Cir. 2008) ("An employer's mandatory overtime requirement has been recognized as an essential job function."); *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000) ("In effect, overtime work in [this] position … is akin to job presence, which has been held to be an essential function of a job.") (collecting cases). Whether attendance requirements are "essential" in a particular case depends on "the employer's judgment" and expectations as well as how those requirements are observed "in the workplace." *Rodrigo*, 879 F.3d at 242.

Here, OCJ's judgment and the YDS job description, together with Smith's own work experience, show that overtime and out-of-shift work were essential to the YDS position. With roughly a third of JTDC employees on leave at any given point, OCJ considered mandatory overtime essential to ensuring constitutionally adequate safety and services for juvenile pretrial detainees. Doc. 51 at ¶¶ 13-15, 18; Doc. 43-4 at ¶ 9; *see Smith v. Burlington Cnty.*, 2004 WL 1932850, at *4 (D.N.J. July 27, 2004) ("We are satisfied that overtime is an essential function of a position as a … corrections officer. … Correctional facilities, with the need for constant security even in the face of under-staffing, unexpected absences, or sudden unrest in the prison population, [may] require that custodial officers work some mandatory overtime to meet security needs.") (footnote omitted). Consistent with this expectation, the YDS job description provided that candidates must be ready "to work any shift at a 24-hour facility (includes evenings, nights, weekends, and holidays)" and "[m]ust be able to work overtime based on departmental needs." Doc. 43-3 at 57-58; Doc. 52-14 at 4; Doc. 51 at ¶ 12; *see Rodrigo*, 879 F.3d at 241 ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.") *(*quoting 42 U.S.C. § 12111(8)). In practice, and pursuant to the CBA, OCJ assigned mandatory overtime shifts to individual staff by selecting names from a list of JTDC personnel. Doc. 56 at ¶ 21. In his three years as a YDS before his injury, Smith worked all three shifts and "a lot of overtime," much of which was mandatory. Doc. 51 at ¶ 17; Doc. 56 at ¶ 21; Doc. 52-2 at 18.

Despite these written expectations and his own experience, Smith contends that overtime and out-of-shift work was not essential because dozens of YDSs in 2017 and 2018 used their

9

FMLA leave to avoid such work. Doc. 53 at 11-12. Smith's argument boils down to this: If OCJ allows employees to take FMLA leave to avoid their overtime and out-of-shift work obligations, those obligations cannot be essential under the ADA. *Ibid.*

This argument incorrectly conflates the FMLA with the ADA. The FMLA protects employees temporarily unable to perform a job's essential functions, while the ADA protects employees who can perform those essential functions with or without a reasonable accommodation. *See Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) ("The FMLA protects up to 12 weeks of medical leave, recognizing that employees will sometimes be *unable* to perform their job duties due to a serious health condition. In contrast, the ADA applies only to those who can do the job.") (internal quotation marks omitted); *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (similar, citing 29 U.S.C. § 2612(a)(1)(D)); *Acker v. GM, LLC*, 853 F.3d 784, 791-92 (5th Cir. 2017) ("The ADA and the FMLA have divergent aims, operate in different ways, and offer disparate relief. … [A]n employee seeking FMLA leave is by nature arguing that he *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he *can* perform the essential functions of the job.") (internal quotation marks omitted). Thus, YDSs' ability to use FMLA leave to temporarily avoid overtime and out-of-shift work does not mean that such work was nonessential—if anything, the fact that YDSs could avoid such work only with FMLA leave reinforces OCJ's position that it was essential. Indeed, the Seventh Circuit has rejected the notion that an employer's granting leave to its employees means that attendance is not an essential job function. *See Taylor-Novotny*, 772 F.3d at 489-90 (explaining that an employer's "willingness to allow employees to work at home … hardly establishes that punctuality and regular attendance are not essential functions of [the] position"); *Murray v. AT&T Mobility LLC*,

374 F. App'x 667, 672 (7th Cir. 2010) ("[The employer] considered attendance to be an essential element of the job, allowing only 12 absence points annually. [The plaintiff] accumulated more than 18 absence points and substantially exceeded her FMLA balance, so it is difficult to see how she met the essential attendance element of her job.").

Smith also contends that overtime and out-of-shift work were not essential functions of the YDS position because they were part of the YDSs' *collective* responsibility to ensure adequate staffing, not obligations that each *individual* YDS had to perform. Doc. 53 at 11-12, 15. Were there evidence in the record that OCJ permitted YDSs the freedom to redistribute their overtime and out-of-shift work obligations to other employees, that argument might possibly have had merit. *See Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir. 2011) (holding that where employees routinely "substitute[d] and reassign[ed]" tasks "among themselves," a genuine factual issue existed as to whether a particular task was "essential"). However, the record indicates that overtime and out-of-shift work was required of each individual YDS, and that only YDSs with FMLA leave could avoid that work. Doc. 51 at ¶ 16; Doc. 56 at ¶¶ 21, 23-24. Accordingly, the possibility that overtime and out-of-shift work obligations could be reassigned among YDSs does not make those obligations nonessential. *See Shell v. Smith*, 789 F.3d 715, 719 (7th Cir. 2015) ("[A]n employer's ability to assign duties to another employer does not make them nonessential … ."); *Basith*, 241 F.3d at 929 ("It is possible that any function, whether or not essential, could be assigned to individual employees. The mere fact that others could do [the plaintiff's] work does not show that the work is nonessential."); *see also Tjernagel*, 533 F.3d at 673 ("When [the plaintiff's] restriction barred overtime, she was unable to perform an essential requirement of her job, being in attendance at work when needed, thereby rendering her unqualified for ADA protection.").

In the end, although he disputes the wisdom of OCJ's judgment, Smith adduces no evidence that OCJ did not actually treat overtime and out-of-shift requirements as essential functions of the YDS position. As a result, the court will not "second-guess [OCJ's] judgment in describing the essential requirements for the job," given that the record shows that YDSs were expected and "actually require[d] … to perform the allegedly essential functions" and that those functions were important to the JTDC's operations. *Basith*, 241 F.3d at 928-29 ("Cook County is allowed to determine the job responsibilities of its pharmacy technicians, and it is not the court's duty to second-guess that judgment so long as the employer's reasons are not pretextual."); *see also Gratzl*, 601 F.3d at 679, 681 ("We presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary. … [T]he fact that restructuring is feasible, in itself, is not persuasive evidence one way or the other that a function is essential to a job.") (internal quotation marks omitted); *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 950 (7th Cir. 2001) (en banc) ("As we have stated in a number of discrimination cases, our role is not to second guess the business decisions of a company and inquire as to whether the goals set by management demand too much from its employees … .") (internal quotation marks omitted).

Before concluding the essential functions discussion, the court notes that Smith does *not* present argument or evidence consistent with Local Rule 56.1 about what proportion of the YDSs' workweek was spent on overtime and out-of-shift work. *See Feldman*, 692 F.3d at 755-56 (reversing summary judgment for the ADA defendant where some job descriptions did not mandate overtime and the plaintiff "furnished data indicating that overtime is rarely worked"). As a result, he forfeits any argument that those obligations are nonessential based on the amount of time YDSs spent on them. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538

(7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … .").

For these reasons, no reasonable jury could find that overtime and out-of-shift work were not essential functions of the YDS position. Because Smith admits that he could not perform those functions without a reasonable accommodation, Doc. 51 at ¶ 31, the court next considers whether a reasonable jury could find that Smith, if given a reasonable accommodation, could have performed that work.

II. **Whether Smith Could Perform Essential Functions of the YDS Position with a Reasonable Accommodation**

Smith asserts that he could have performed the YDS position's essential functions with a reasonable accommodation and that OCJ denied him such an accommodation. Doc. 53 at 13-15. "A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'" *Severson*, 872 F.3d at 481 (quoting 42 U.S.C. § 12111(8)). "Under the ADA, a 'reasonable accommodation' may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, … and other similar accommodations for individuals with disabilities.'" *Stern*, 788 F.3d at 288 (quoting 42 U.S.C. § 12111(9)(B)). Smith "bears the burden of establishing that [h]e could perform the essential functions of the [YDS] position with … reasonable accommodation, and can't meet this burden if the only accommodations suggested were unreasonable." *Majors v. GE Co.*, 714 F.3d 527, 534 (7th Cir. 2013).

The only accommodation Smith references in his summary judgment opposition is the one he proposed before being terminated in April 2016 and again at the July 2016 meeting:

"working forty (40) hours per week on [the overnight] shift only until August, 2016 when [he] would be re-evaluated by [his] physician." Doc. 52-19; Doc. 51 at ¶¶ 33, 40; Doc. 56 at ¶ 14. Smith admits that, despite having exhausted his non-FMLA leave and not being eligible for FMLA leave, Doc. 51 at ¶ 49; Doc. 56 at ¶ 5, he seeks the same treatment as the YDSs who used FMLA leave in place of their assigned overtime and out-of-shift work. Doc. 53 at 15 ("[T]he JTDC could have allowed Plaintiff to work no overtime on the [overnight] shift in a manner like the 86 employees with the same restrictions through FMLA … ."). The trouble with Smith's position is that obtaining an "open-ended" amount of leave beyond that required by the FMLA is not a "reasonable accommodation" under the ADA. *Severson*, 872 F.3d at 482 ("If … employees are entitled to extended time off as a reasonable accommodation, the ADA is transformed into a medical-leave statute—in effect, an open-ended extension of the FMLA. That's an untenable interpretation of the term 'reasonable accommodation.'"); *Yellow Freight*, 253 F.3d at 950 ("[T]his court has held that similar requests for unlimited sick days, if needed, without being penalized, are not reasonable as a matter of law.") (alteration and internal quotation marks omitted); *see also Acker*, 853 F.3d at 791 ("[A] request for FMLA leave is not a request for a reasonable accommodation under the ADA."); *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 n.4 (8th Cir. 2001) ("[T]he regulations regarding FMLA clearly state that 'the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the [ADA].'") (second and third alterations in original) (quoting 29 C.F.R. § 825.702(a)).

Moreover, Smith adduces no evidence concerning whether or when his restrictions would have abated. Although Smith's physician told him that the restrictions might eventually be lifted so that he could "crawl, walk, and then run" at work, there is no evidence in the record about the

timeline or probability for his recovery, let alone that OCJ was told about this "crawl, walk, and then run" strategy. Doc. 56 at ¶ 8 (quoting Doc. 52-2 at 31); Doc. 51 at ¶ 31; Doc. 52-16 at 2, 5. As a result, Smith's requested exemption from YDSs' essential attendance requirements was functionally unlimited in duration, and thus not reasonable under the ADA as a matter of law. *See Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 686 (7th Cir. 2017) (affirming summary judgment where there was not "sufficient evidence to allow a trier of fact to find that, if the [employer] had given [the plaintiff] additional unpaid leave, she likely would have been able to return to work on a regular basis"); *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013) (affirming summary judgment for the employer where, "at the time of [the plaintiff's] termination, she had no … anticipated date by which she could have been expected to attend work regularly even if she had been granted leave" as an ADA accommodation); *see also Winston v. Ross*, 725 F. App'x 659, 663-64 (10th Cir. 2018) ("Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job *in the near future* and therefore whether the leave request is a reasonable accommodation.") (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1130 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)). Smith's supposition that other YDSs could have covered his assigned shifts without disrupting the JTDC's operations, Doc. 53 at 15, fails as well, for "[t]o have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Majors*, 714 F.3d at 534; *see also Stern*, 788 F.3d at 290 ("If a particular job function … is an essential function, then it is irrelevant whether the employer could have someone else perform the function without undue hardship."); *Davis*, 205 F.3d at 1307 ("If [the plaintiff] were given the accommodation of no overtime … , then [other]

15

employees, who otherwise would not have to work overtime, would be required to do so, and that is not required by the ADA.").

Smith has not argued for any other potential accommodation or contended that he was qualified for another JTDC position, thereby forfeiting those points. *See G & S Holdings*, 697 F.3d at 538; *Alioto*, 651 F.3d at 721. Even setting aside forfeiture, the only alternative position evident from the summary judgment record—a position occupied by the individuals in "red polo shirts" who did not interact with JTDC residents—was eliminated a year before OCJ fired Smith. Doc. 51 at ¶¶ 54-56. Because the ADA does not require an employer to create (or recreate) a position for an employee with disabilities, any argument about the "red polo shirts" on this record would fail. *See Dunderdale*, 807 F.3d at 855-56 ("[E]mployers do not have to maintain positions or job structures that provide reasonable accommodations if the employer finds, for legitimate business reasons, that the position or job structure should be eliminated."); *Gratzl*, 601 F.3d at 680 ("Just as an employer is not required to create a new position or strip a current job of its essential functions, an employer is not required to maintain an existing position or structure that, for legitimate reasons, it no longer believes is appropriate."); *see also Tjernagel*, 533 F.3d at 673 ("[The plaintiff] could not be reasonably accommodated by moving her to a different … position without an overtime requirement because no such … positions existed.").

Instead of pressing alternative accommodations or positions, Smith focuses on OCJ's alleged failure before he was fired to engage in the interactive process to identify a reasonable accommodation. Doc. 53 at 13-14. Smith is correct that the ADA "requires both employer and employee to engage in a flexible, interactive process" to "identif[y] reasonable accommodations for a disabled employee." *Brown v. Milwaukee Bd. of Sch. Dirs.*, 855 F.3d 818, 821 (7th Cir. 2017). But any "[f]ailure of the interactive process is not an independent basis for liability under

the ADA." *Severson*, 872 F.3d at 480 n.1 (internal quotation marks omitted); *see also Sansone v. Brennan*, 917 F.3d 975, 979-80 (7th Cir. 2019) ("While the interactive process is important, it is a means for identifying a reasonable accommodation rather than an end in itself. And because the process is not an end in itself, an employer cannot be liable solely for refusing to take part in it.") (citation and internal quotation marks omitted). To the contrary, "[e]ven if [OCJ] fail[ed] to engage in the required process, that failure need not be considered if [Smith] fails to present evidence sufficient to reach the jury on the question of whether [h]e was able to perform the essential functions of h[is] job with an accommodation." *Stern*, 788 F.3d at 292 (internal quotation marks omitted); *see also Majors*, 714 F.3d at 535 ("This record wouldn't allow a finding that [the plaintiff] was a qualified individual, so whether the discussion between [the employer] and [the plaintiff] was sufficiently interactive is immaterial.").

Smith's inability to identify a reasonable accommodation that would have allowed him to perform the YDS's essential functions defeats his interactive process argument and distinguishes the cases he cites. Doc. 53 at 14; Doc. 59 at ¶¶ 10-12. In the two cases his discusses, the ADA plaintiff identified a reasonable accommodation that was thwarted by a breakdown in the interactive process. *See Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061-62 (7th Cir. 2014) (allowing the plaintiff's failure to accommodate claim to proceed to trial where the defendant failed to "collaborate … to find a reasonable accommodation" *and* "[t]he evidence suggest[ed] that a reasonable accommodation was readily available"); *Sams v. City of Chicago*, 2018 WL 4679581, at *13 (N.D. Ill. Sept. 28, 2018) (denying summary judgment where the defendant had other positions that could accommodate the plaintiff's disability *and* the parties disputed whether the plaintiff was told about those positions or provided with "reasonable accommodation paperwork"); *see also Sansone*, 917 F.3d at 979 (noting that "cooperation in an

interactive process to determine a reasonable accommodation" is "[r]elevant to" whether the employer "failed to reasonably accommodate [the plaintiff's] disability," not to whether the plaintiff "was a qualified individual with a disability") (internal quotation marks omitted). Moreover, that Smith remained unable to identify a reasonable accommodation at the July 2016 meeting, over two months after his termination, reinforces the conclusion that OCJ's "alleged failure to adequately engage in the interactive process" before his termination "is immaterial" because he cannot "show that a reasonable accommodation could be made." *Stern*, 788 F.3d at 292-93 (internal quotation marks omitted).

Accordingly, Smith has not adduced sufficient evidence to convince a reasonable jury that in April 2016 he could "perform the essential functions of the" YDS position—specifically, overtime and out-of-shift work—"with or without reasonable accommodation." *Id*. at 285 (quoting 42 U.S.C. § 12111(8)). It follows that Smith was not "a qualified individual for ADA purposes," *Basden*, 714 F.3d at 1039, thus entitling OCJ to summary judgment on his ADA disparate treatment and failure to accommodate claims.

## Conclusion

OCJ's summary judgment motion is granted. Smith also has an indemnification claim against Cook County, that claim rises or falls with his ADA claims against OCJ. Doc. 24 at ¶¶ 45-47; Doc. 42 at 13. Judgment will be entered for Defendants and against Smith.

April 8, 2019

United States District Judge

18